PLEAS WILLIAMS v. STATE OF MISSISSIPPI.

[43 South., 467.]

1. CRIMINAL LAW AND PROCEDURE. *Homicide. Instructions. Manslaughter.*

An instruction predicated of an assumption that defendant was excusable for firing two fatal shots into the body of the deceased, but seeking a conviction of manslaughter because of the firing of subsequent shots, should not be given in the absence of all evidence that the subsequent shots shortened the life of the deceased.

2. SAME.

In cases of homicide the right of self-defense should not be narrowed by instructions for the state for which there is no predicate in the evidence.

FROM the circuit court of Leake county.

HON. JAMES R. BYRD, Judge.

Williams, appellant, was indicted and tried for the murder of one Henson, convicted of manslaughter and sentenced to the penitentiary for five years. From such conviction and sentence he appealed to the supreme court.

The opinion of the court states the facts.

*May, Flowers & Whitfield,* and *C. S. Dobbs,* for the appellant.

The evidence shows that the character of the deceased was, to quote the language of different witnesses for the state, "very dangerous." He lived in another county than the one in which he was killed, and so far as the record discloses, had never been before seen in Leake county. Both Henson and his son were armed and were both very boisterous, disturbing those who were on the grounds and in the vicinity of the church by the promiscuous shooting of pistols and by noisy and blasphemous conduct. Bad feeling had for some time existed between Hen-

son and the appellant growing out of the active part taken by appellant in the prosecution of Henson for a homicide committed some time before. Different persons were selected to arrest Henson, but inasmuch as he waved his knife and swore that all the men in Leake county could not arrest him, he was not taken into custody.. It was only after the appellant, Williams, was notified of threats against him and his brother by the decedent, that he armed himself. The purpose of appellant in going to the church was to protect his brother if his brother should be in danger. While it is true that different friends of the appellant urged him to leave the grounds a short time before the encounter, this was merely because of the general apprehension of trouble if Henson, in his drunkenness and violent condition, should meet appellant. It is not denied that the appellant told different persons that he would not seek Henson and that appellant had no idea of meeting Henson at the place where the difficulty took place. When appellant met Henson his salutation was courteous, but Henson replied by cursing him. Different witnesses, including one witness for the state, testified that Henson made a motion as if to reach for his pistol when Williams struck his hand down. But for the fact that Henson's pistol and hand caught in his shirt while drawing it, appellant would have been shot. Henson was a very strong man, weighing almost 180 pounds. The appellant was a man of delicate appearance, weighing about 125 pounds. It cannot be denied that the appellant shot in self-defense, firing two shots very rapidly at Henson, whereupon Henson fell, and that thereupon Williams turning sideways continued to shoot and fired the last three shots.

Under the facts as above stated it was error for the court to grant the third instruction to the state. This instruction was to the effect that if the jury found that the appellant Williams armed himself in order to kill Henson and went to where Henson was, and provoked a difficulty with him to kill him, and being so armed for the purpose stated, raised a difficulty with

Henson, and in pursuance of such purpose killed Henson, then the appellant could not claim self-defense. In the first place, the instruction is not technically accurate, because if the jury should believe that the conduct of appellant provoked the difficulty, they were incorrectly authorized by the instruction to ignore appellant's right of self-denfense, even though they should believe from the evidence that appellant had no intention of provoking any difficulty when he procured the weapon. The instruction rendered worthless the testimony of the appellant himself as to his purpose in getting his pistol. In the second place, there was no evidence of which to predicate the instruction, for it is not shown that the appellant armed himself for the purpose of going in search of Henson and provoking a difficulty with him in order to kill him. And in any case it is a dangerous instruction, for a set of circumstances could hardly be framed to which the instruction could be profitably applied on the part of the state. Circumstances strong enough to warrant this instruction are strong enough to make it very certain that the jury will convict. Instructions like this have been more frequently condemned by this court than any other form of instruction in homicide trials. Appellant made no search for Henson. The difficulty was a mutual combat. If appellant in any way provoked the difficulty, he did it simply by going into Henson's presence,—an act insufficient to show provocation. Wharton on Homicide (3d ed.) par. 325; *Long* v. *State,* 52 Miss., 23; *Prine* v. *State,* 73 Miss., 838, s.c., 19 South., 711; *Patterson* v. *State,* 75 Miss., 670, s.c., 23 South., 647; *Lofton* v. *State,* 79 Miss., 723, s.c., 31 South., 420; *Cooper* v. *State,* 80 Miss., 175, s.c., 31 South., 579; *Rogers* v. *State,* 82 Miss., 479, s.c., 34 South., 320; *Pulpus* v. *State,* 82 Miss., 548, s.c., 34 South., 2; *Jones* v. *State,* 84 Miss., 195, s.c., 36 South., 243; *Herring* v. *State,* 87 Miss., 628, s.c., 40 South., 230; *Saffold* v. *State,* 76 Miss., 259, s.c., 24 South., 314.

The fourth instruction for the state is also erroneous, and

there was palpable error in granting it.   There was ample evidence, as above shown, that appellant shot in self-defense, and that when Henson had partly fallen after having been shot twice and was attempting to shoot appellant, the latter shot three times.   But, as we have above shown, there was no evidence that these last three shots shortened the life of the decedent.   Yet this fourth instruction for the state is to the effect that if accused by these last three shots shortened the life of decedent, appellant was under such circumstances guilty of manslaughter, even though the appellant in the heat of passion fired the last three shots.   There was no testimony to show that these last three shots in any way hastened decedent's death, hence no jury would be warranted in drawing the conclusion that the last three were the fatal shots.   *Beasley* v. *State,* 64 Miss., 518, 8 South., 234.

*O. A. Luckett,* on the same side.

The third instruction granted to the state was fatally erroneous, taking into consideration the circumstances of the case and the total absence of evidence to support the instruction.   We are at a loss to know upon what theory the court could have granted such an instruction taking away altogether the appellant's right to defend himself against a murderous attack.   The granting of this instruction is alone sufficient to reverse the case.   *Cooper* v. *State,* 80 Miss., 175, s.c., 31 South., 579; *Oliver* v. *State,* 39 Miss., 526; *Fortenbery* v. *State,* 55 Miss., 403; *Spradley* v. *State,* 80 Miss., 82, s.c., 31 South., 534.

While it is true, as contended by the learned attorney-general, that a large number of instructions were granted for the appellant, there was no instruction granted to either side which cured the vice contained in the aforesaid third instruction for the state.   We must conclude that this instruction misled the jury into bringing in the verdict of manslaughter.

There was no way for the jury to reconcile this third instruc-

tion for the state with the other instructions, especially those for appellant. Hence, as the jury had no chart nor compass to which they could look for safety as to the law of this case in their deliberations and were doubtless tossed about by every wind of doctrine, one can hardly wonder at their verdict. Where the evidence is as sharply drawn as existed in this case, it is essentially important that there should be no conflict in the instructions. *Whitfield* v. *Westbrook,* 40 Miss., 311; *Chapman* v. *Copeland,* 55 Miss., 476; *May* v. *State,* 35 Tex., 650; Enc. Pl. & Pr., 145; Hughes Crim. Law & Proc., 862.

The granting of the fourth instruction for the state was also erroneous. As shown in the brief of colleagues, this instruction was to the effect that if the jury should find from the evidence that Williams shot Henson twice, disabling him, and that while Henson was lying on the ground appellant, being in no real or apparent danger of great bodily harm, fired three more shots into Henson's body, whereby Henson's life was shortened, then the jury should find the defendant guilty of manslaughter, even though defendant, in the heat of passion, fired the last three shots. Such instruction is erroneous for several reasons: (1) it assumed a disputed fact, namely, that Henson was disabled and lying prostrate on the ground when the last three shots were fired; (2) that appellant was at the time in no danger real or apparent; (3) and that there was a measurable interval of time between the first two and the last three shots; and (4) that these last three shots shortened the life of decedent. These assumptions of fact being unwarranted from the evidence, made the granting of the instruction manifest error. *Cooper* v. *State,* 80 Miss., 176, s.c., 31 South., 579; *Bell* v. *State,* 89 Miss., 810, 42 South., 542; *Bonds* v. *People,* 39 Ill., 26; *Hatch* v. *Garza,* 20 Ark., 171.

There were no elements of murder in the case, and it was a close case of facts whether the defendant was guilty of manslaughter or acted in necessary self-defense.

An additional reason why this fourth instruction was er-

roneous is that the court nowhere defines to the jury what were the essential facts to constitute manslaughter under our statute, hence it was a leap in the dark for twelve ordinary farmers, such as were the jury, to tell just exactly what did or did not constitute manslaughter. *State* v. *Sloan,* 47 Mo., 604; *Payne* v. *Comm:,* 1 Met. (Ky.), 370. See also the able dissenting opinion of WHITFIELD, C. J., in the *Lipscomb case,* 75 Miss., 599, s.c., 23 South., 210, which, in our opinion, is the law.

*Byrd, Wilson & Richardson,* and *Presley Groves,* on the same side.

The fourth instruction for the state was, under the circumstances, erroneous. There was evidence that the appellant shot Henson in self-defense. It cannot be denied that Henson was drunk, and had been giving trouble practically all the day, and steps had been taken to arrest him, but without avail. Although it may be that the appellant shot Henson three times after Henson had fallen, there was no evidence that these three shots shortened Henson's life. The court will see that the language of this instruction was a palpable request to the jury for some sort of conviction. The instruction authorized the jury to find a verdict of manslaughter, based on the firing of the last three shots, although the entire five shots, to-wit, these shots and the two preceding, might have been fired in rapid succession. The jury were not required to find any interval between the first two and the last three shots, nor that appellant had time to see that the last three shots were unnecessary. Nor were they required to find that there was any interval at all, much less, such interval as would enable the appellant to regain control of himself, after escaping from the imminent danger. With a rapidly firing pistol, the five shots could have been made in a very short time, possibly in two or three seconds. No witnesses testified that there was any interval between the first two and the last three shots. Yet, the jury were authorized to find the verdict of manslaughter, even though they

should believe there was no perceptible interval at all, and that the shots were fired in rapid succession, and all of them before Henson fell to the ground. The instruction was improper, also, because there was no testimony to show that the last three shots caused, or in any way hastened the death. It is impossible to say which of the five shots caused the death. The instruction comes within the condemnation of this court, as cited in *Godwin* v. *State,* 73 Miss., 873, s.c., 19 South., 712.

The third instruction for the state is also erroneous, for the reasons stated in the briefs of our colleagues.

*R. V. Fletcher,* attorney-general, for the appellee.

It can hardly be contended, as an abstract proposition of law, that the fourth instruction for the state was erroneous. This instruction charged the jury that if they believed beyond reasonable doubt that the appellant shot Henson twice, and that when Henson was disabled and had fallen to the ground, appellant, being in no real or apparent danger, fired three more shots into the prostrate body of Henson, and these last three shots shortened the life of Henson, then the jury should find the defendant guilty of manslaughter, even though appellant fired these last three shots in the heat of passion. The proof shows almost without dispute that a short interval elapsed between the first two and the last three shots. One witness says that after the first two shots the appellant advanced and stopped before shooting again. Other witnesses say that he stepped aside after the first two shots, hence there is ample evidence that there was a pause in the midst of the firing. Many witnesses say that after the first two shots were fired, Henson had fallen, and was making no effort to do anything. Appellant seeks to justify these last three shots by showing that, when he fired the third shot, Henson was still attempting to use his pistol, and it is contended by opposing counsel that there is no proof that the last three shots were the cause of or hastened the death of Henson. Yet several witnesses for the

state testify that although Henson was struck by the first two shots he did not immediately fall prostrate but was resting on his hip and elbow, and fell dead only after the fifth shot. It is evident from what these witnesses say that the death did not ensue until after the fifth shot. This instruction accordingly should not reverse the case if this court finds that there was proof from which the jury might conclude that the last three were the fatal shots.

Opposing counsel contend that the third instruction for the state is also erroneous. This instruction is to the effect that if the jury should find that appellant armed himself with a pistol for the purpose of killing Henson, and went to Henson and provoked the difficulty with him in order to take his life, and did kill him, then appellant cannot justify his action on the ground of self-defense. It cannot be denied that, as an abstract proposition of law, this instruction is correct. It was shown in evidence that the appellant heard that Henson was making threats against him, and that appellant was advised by friends to stay away from the church that afternoon; that appellant armed himself at his home; and he himself frankly admits that he did so in expectation of having a difficulty with Henson. Friends attempted to persuade him not to go where he might find Henson, but he replied that he wanted to see the color of Henson's eyes. It is undisputed that he deliberately left the traveled pathway and went fifteen or twenty feet out of his way to where Henson was eating his dinner in order to accost him. Seven disinterested witnesses testified that appellant was the aggressor in the difficulty. Hence it is submitted that there was sufficient showing of facts to uphold the instruction.

But even if either of the two instructions by itself be considered erroneous, it must be kept in mind that there were twenty-nine liberal instructions granted for the appellant advising the jury of his many different rights, for instance; the right of self-defense, the right to bear arms, the right to arm

himself, the right to go to the church, and to travel any route he desired.

Argued orally by *J. N. Flowers,* and *A. M. Byrd,* for appellant, and by *R. V. Fletcher,* attorney-general, for appellee.

CALHOON, J., delivered the opinion of the court.

Williams was indicted for murder and convicted of manslaughter. It is fairly to be deduced from this record that the man he killed was drunk and that Williams was sober; that the deceased was much the more powerful man and in robust health; that Williams was sober, but weak, and a victim of tuberculosis. The occasion was an annual gathering at the church, where there was to be baptizing and then a foot-washing according to the practices of that particular congregation. At such events it appears that the whole neighborhood gathered for miles. The deceased lived in another county and had never been seen there before. His character, as shown by many witnesses, was that of being quite violent, and, in the language of some of the state witnesses, "very dangerous." On that particular Sunday he appeared there and was armed, and had his son with him, who was also armed. He and his following were very boisterous, and disturbed those on the grounds by the promiscuous shooting of pistols and violent, noisy, and blasphemous conduct. The deceased had a grudge against appellant and against appellant's brother, arising out of some conduct of theirs in the prosecution of deceased for shooting a man some time before. The conduct of deceased was such on or near the church grounds that thirty men were selected to arrest him, but they were afraid to do it; he waving a knife and swearing that all the men in Leake county could not arrest him. He had been making threats against Williams and his brother, and was inquiring for them. Because of his very dangerous character, Williams' friends induced him to go home, which he did; his home being about two hundred and fifty yards from the church.

He was in the habit of going to and from the church by follow-
ing a by-path through the woods, which made the distance
nearer by one-fourth to one-half. Williams went, being then
unarmed; but, hearing a renewal of gun shooting or pistol
shooting towards the church, he became uneasy about the safety
of his brother, who, as he thought, was at the church. There-
upon he got his pistol, and put on a "jumper" coat, and took
that path to go to the church, in order to protect his brother,
if in danger. In following that path, and near the church, he
came to a place where there was a wagon, at which deceased
was standing. As testified to by one of the witnesses for the
state, there was general apprehension of trouble if Henson,
the deceased, should see Williams, which explains the fact that
the friends of Williams induced him to leave the grounds a
short time before the encounter. It appears to be also certain
that Williams had told his friends that he would not seek Hen-
son, and, if he saw him, would speak to him in a friendly way.
It is also clear that Williams had no idea that he would find
Henson on the path which he took from his home to the church.
It appears that when Williams came up to Henson, and shook
hands with him, and asked him, "How are you?" Henson re-
sponded with a blasphemous salutation and the statement "I am
well enough for you." This appears from a state witness, who
also says that Henson made the first motion with his hand up,
presumably, of course, from the statement of many witnesses, to
reach for his pistol, when Williams struck his hand down. Sev-
eral witnesses testify that Henson got his pistol out first, but he
caught it in his shirt with his thumb in drawing it. Others tes-
tify that the pistols were produced about the same time, but Wil-
liams got the first shot. One of the state witnesses testifies
that Henson cursed Williams and "raised his hand to get his
gun." Certain it is that Williams fired very rapidly two shots,
when Henson fell on his hands or elbows and knees, and then it
appears from several witnesses, and among them some for the
state, who say that when Henson fell on his knees and elbows he

was trying to shoot his pistol at Williams from the ground, when it was called by by-standers, "Look out, Pleas!" when Williams shot him three times again. This is testified to by witnesses for the state, as well as for the defense. It will be seen that Williams fired two shots very rapidly at Henson standing, when Henson fell, when there was a pause, and Williams turned sideways and then made the last three shots. As a matter of fact it is questionable whether the pause was more than a second.

The foregoing is a general, but fair, résumé of the prominent features in this case, whereupon the court gave the following instruction for the state: "The court instructs the jury that if they believe from the evidence beyond a reasonable doubt that Williams shot Henson two shots, and that Henson was then disabled and on the ground, and while Henson was so disabled and Williams in no danger, real or apparent, of losing his life or having some great bodily harm done him, fired three more shots into the body of Henson, and that such last shooting shortened the life of Henson, then the jury should find the defendant guilty of manslaughter, and that even though Williams in the heat of passion fired the last shots." This action of the court was erroneous. In situations like this the action of the human mind or the impulses of the human heart cannot be measured by half seconds, and the state cannot make a bonfire with no other fuel than a splinter like this. Besides, there is no sort of proof that the last three shots shortened Henson's life. On the contrary, we judge from the testimony that the first two shots were fatal, and that Henson did not live more, perhaps, than three to five seconds, and no jury would be warranted in drawing the conclusion that the last three shots shortened his life. *Beasley* v. *State,* 64 Miss., 518, 8 South., 234.

It was also error to grant this instruction, which was given at the instance of the state, viz.: "The court instructs the jury that if they believe beyond a reasonable doubt from the evidence

in this case that Pleas Williams armed himself with the pistol for the purpose of killing John Henson, and went to where John Henson was and provoked the difficulty with him in order to get to kill him, and so armed for the purpose of killing him, raised the difficulty with John Henson, and in pursuance of such purpose killed John Henson, then the defendant cannot justify on the ground of self-defense." There was no evidence whatever before the jury that Williams armed himself with the pistol for the purpose of killing Henson, or that he knew the place where Henson was, or that he went to him and provoked the difficulty with him.

*It follows that this case must be reversed and remanded.*